**UNITED STATES of America and Janet Reno, Attorney General of the United States of America, Plaintiffs,**

v.

**Regina Rene DINWIDDIE, Defendant.**

No. 95–0010–CV–W–8.

United States District Court,
W.D. Missouri,
Western Division.

March 21, 1995.

Stephen L. Hill, Jr., U.S. Atty., Alleen S. Castellani, Asst. U.S. Atty., Kansas City, MO, for plaintiffs.

Joseph A. Morrey, St. Joseph, MO, Michael R. Hirsh, Howardstown, KY, for defendant.

## PERMANENT INJUNCTION

STEVENS, Chief Judge.

The Court grants plaintiffs' application filed on January 6, 1995 for permanent injunction to enjoin defendant from violating the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), Pub.L. No. 103–259, 108 Stat. 694 (1994) (to be codified at 18 U.S.C. § 248), which was signed by President Clinton on May 26, 1994.

## I. Procedural History

On January 6, 1995, plaintiffs filed: (1) a complaint[1] to enjoin defendant from violating FACE; and (2) an application for temporary restraining order and further injunctive relief pursuant to FACE and Rule 65 of the Federal Rules of Civil Procedure. The same day, this Court: (1) conducted a hearing on the application for temporary restraining order ("first hearing") at which the parties had the opportunity to present witnesses, cross-examine witnesses, submit evidence, and argue orally; and (2) filed a written order that granted the application.

On January 26, 1995, the Court conducted a hearing on the application for preliminary injunction ("second hearing") at which the parties had the opportunity to offer written suggestions, present witnesses, cross-examine witnesses, submit evidence, and argue orally. On January 27, 1995, the Court filed a written order reiterating the ruling from the bench the prior day that granted the application. On February 3, 1995, the Court filed an order explaining the preliminary injunction.

On March 9, 1995, the Court conducted a hearing on the application for permanent injunction ("third hearing") at which the parties had the opportunity to offer written suggestions, present witnesses, cross-examine witnesses, submit evidence, and argue orally. As explained below, today the Court grants the application for permanent injunction.

## II. The Freedom of Access to Clinic Entrances Act

### A. Statutory Provisions

Congress enacted FACE to protect public health and safety by prohibiting violence and threats of violence around reproductive health facilities. Our nation recently has seen scores of injuries and killings in the context of protests and obstructions around the entrances to such facilities. For example, between 1977 and mid–1993, more than 6,000 clinic blockades and disruptions were reported in the United States. S.Rep. 117, 103d Cong. 1st Sess. 31 (1993); H.R.Rep. No. 306, 103d Cong.2d Sess. 6–7 (1993), *reprinted in* 1994 U.S.C.C.A.N. 699, 703. In the same timespan, more than 1,000 acts of violence against providers of abortions were reported, including 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic invasions, 71 chemical attacks, and one murder. *Id.* Congress acknowledged that state and local law enforcement agencies

---

1. Although the complaint filed on January 6, 1995 sought both equitable relief and compensatory damages, the amended complaint filed on January 25, 1995 and the second amended complaint filed on January 27, 1995 seek only equitable relief pursuant to 18 U.S.C. § 248(c)(2)(B).

were often unable and sometimes unwilling to protect the patients and staffs of the facilities from violence and severe disruption. S.Rep. No. 117 at 3, 18–21; H.R.Rep. No. 306 at 10, 1994 U.S.Code Cong. & Admin.News at 703.

■ FACE protects public safety and health by establishing criminal penalties and civil remedies for certain violent, threatening, obstructive, and destructive conduct that is intended to injure, intimidate, or interfere with persons seeking to obtain or provide reproductive health services. FACE provides criminal and civil penalties against anyone who:

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to interfere with any person because that person is or has been, or in order to intimidate such person or any person or any class of persons from, obtaining or providing reproductive health services ...

18 U.S.C. § 248(a)(1).[2]

FACE defines its key terms. 18 U.S.C. § 248(e). "Interfere with" means "to restrict a person's freedom of movement." "Intimidate" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." "Physical obstruction" means "rendering impassable ingress and egress from a facility that provides reproductive health services ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." "Reproductive health services" means "reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling, or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of pregnancy." Additionally, "force" and "threat of force" are terms that are well-grounded in the common law.

Congress was acutely aware of the parameters of constitutionally protected speech in its enactment of FACE. As a rule of construction, FACE provides: "[n]othing in this section shall be construed ... to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment ..." 18 U.S.C. § 248(d)(1).

In addition to criminal penalties, FACE prescribes civil remedies: "the court may award appropriate relief, including temporary, preliminary, or permanent injunctive relief and compensatory and punitive damages, as well as the costs of suit and reasonable fees for attorneys and expert witness." 18 U.S.C. § 248(c)(1)(B). In addition to private rights of action, FACE authorizes civil actions by the Attorney General of the United States.

## B. Facial Constitutionality

■ Defendant has argued persistently on several grounds that FACE is facially unconstitutional. None of those arguments is persuasive. This Court incorporates its holdings and analyses in the temporary restraining order filed on January 6, 1995 and the preliminary injunction filed on February 3, 1995 and reiterates that FACE: (1) prohibits conduct rather than speech; (2) is content-neutral; (3) is viewpoint-neutral; (4) is not unconstitutionally overbroad; and (5) is not unconstitutionally vague. FACE also does not violate: (1) the equal protection clauses of the Fifth and Fourteenth Amendments; (2) the excessive fines and cruel and unusual punishment clauses of the Eighth Amendment; (3) the free exercise clause of the First Amendment; or (4) the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb (1993). These arguments are not issues of first impression in the federal courts. The United States Court of Appeals for the Fourth Circuit ruled on the facial constitutionality of FACE on February

---

**2.** FACE also provides penalties against anyone who intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services. 18 U.S.C. § 248(a)(3). Finally, FACE prohibits such activities if directed at any person lawfully exercising or seeking to exercise the right of religious freedom at a place of religious worship, or, the property of a place of religious worship. 18 U.S.C. § 248(a)(2). These provisions of FACE, however, are not at issue in this case.

13, 1995.[3] Similarly, other federal district courts have consistently held that FACE is facially constitutional.[4]

## III. Permanent Injunction

### A. Evidence

#### 1. Hearings

The first hearing was attended by United States Attorney Stephen Hill, Jr., Deputy United States Attorney Alleen Castellani, defendant Regina Dinwiddie, and defense counsel Joseph Morrey. Plaintiff presented three witnesses: (1) Vickie Larson Gibson, a public health officer for Kansas City, Missouri; (2) Dr. Robert Crist, Medical Director and a physician at Planned Parenthood of Greater Kansas City, 1001 East 47th Street, Kansas City, Missouri, 64110 ("Planned Parenthood"); and (3) Patricia Catlin Brous, Executive Director of Planned Parenthood. Defendant presented two witnesses: (1) Kathryn Coons, the mother of Dinwiddie; and (2) Dinwiddie. Plaintiff submitted three exhibits: (1) a copy of a petition signed by Dinwiddie and distributed by Defensive Action, an organization directed by Paul Hill that promotes the use of force in defending the lives of unborn children; (2) a photograph of Anthony Leake picketing at Planned Parenthood and holding a placard stating: "Abortionists Get Out Before You Are Taken Out Proverbs 24:11"; and (3) a newscast videotape from a Kansas City television station that featured Dinwiddie espousing violent conduct.

The second hearing was attended by Hill, Castellani, Dinwiddie, Morrey, and defense counsel Michael Hirsh, who was admitted *pro hac vice*. By stipulation of the parties, the testimony elicited and exhibits admitted at the first hearing were admitted without objection by either party. Plaintiffs presented two more witnesses: (1) John Rich, Operations Director at Planned Parenthood; and (2) Lenard Venable, a Maintenance Supervisor at Planned Parenthood. Defendant presented four witnesses: (1) James Golden, an acquaintance of Dinwiddie through his work as a radio station disc jockey; (2) Anthony Leake, the anti-abortion picketer of Planned Parenthood who appeared in plaintiff's exhibit no. 2 from the first hearing; (3) David Meade, Pastor of People's Church, Inc. and a friend of Dinwiddie; and (4) Dinwiddie. Following witness examinations, counsel presented oral arguments on the constitutionality of FACE.

The third hearing was attended by Hill, Castellani, Dinwiddie, Morrey, and Hirsh. By stipulation of the parties, the testimony elicited and exhibits admitted at the first two hearings were admitted without objection by either party. Plaintiffs presented one more exhibit, a document entitled "Interrogatories, Requests for Production of Documents, and Requests for Admission" sent by defendant to plaintiffs via facsimile on February 21, 1995 at 6:16 p.m. Defense counsel elicited further testimony by Dinwiddie and presented two exhibits: (1) a document entitled "Locations in Kansas City Contemplated by 18 U.S.C. § 248" that listed several local ad-

---

**3.** *American Life League v. Reno*, 47 F.3d 642 (4th Cir.1995) (holding that FACE: is within Congressional commerce power, is not barred by principles of federalism, does not violate the free speech clause, does not violate the free exercise clause, does not violate the RFRA, targets unprotected activity, serves substantial government interests, is content-neutral, is viewpoint-neutral, is narrowly tailored, is not vague or overbroad, and is not aimed at expression), 855 F.Supp. 137 (E.D.Va.1994); *Woodall v. Reno*, 47 F.3d 656 (4th Cir.1995) (rejecting arguments that FACE violates the First Amendment or is vague or overbroad), 855 F.Supp. 137 (E.D.Va.1994).

**4.** *See United States v. Brock*, 863 F.Supp. 851 (E.D.Wis.1994) (holding that FACE is neither a content-based restriction on speech nor a vague or overbroad statute); *Cook v. Reno*, 859 F.Supp. 1008 (W.D.La.1994) (holding on motion for de-

claratory and preliminary injunctive relief that FACE does not restrict free speech and is not a content-based restriction applicable only to anti-abortion activists); *Council for Life Coalition v. Reno*, 856 F.Supp. 1422 (S.D.Cal.1994) (holding that FACE does not violate right to freedom of expression, does not violate right to freedom of association, does not violate free exercise clause, does not violate establishment clause, does not violate commerce clause, does not violate RFRA, is not overbroad, and is not vague); *Council for Life Coalition v. Reno*, 856 F.Supp. 1422 (S.D.Cal.1994) (denying plaintiffs' motion for preliminary injunction and incorporating by reference the findings of the district court in *American Life League*); *Reily v. Reno*, No. CIV–94–1058–RHX–RGS (D.Ariz. Aug. 12, 1994); *United States v. Hill*, No. 94–03118–RV (N.D.Fla. Sept. 15, 1994).

dresses ("list"); and (2) an enlarged map depicting a portion of greater Kansas City with orange circular decals purporting to indicate the way in which the preliminary injunction affected Dinwiddie ("map"). Following the testimony, counsel presented oral arguments on various aspects of FACE.

## 2. Background Events

Plaintiffs state several background events that either: (1) transpired prior to the enactment of FACE; or (2) are not linked directly to Dinwiddie. Although such events do not bear directly on the liability of Dinwiddie under FACE, they are relevant to the definitions in 18 U.S.C. § 248(e). For example, "intimidate" means to place a person in reasonable apprehension of bodily harm to him or herself or to another." 18 U.S.C. § 248(e)(3). Plaintiffs have presented evidence of several events the occurrence of which are material to the alleged victims' reasonable apprehensions of bodily harm. These include: (1) national statistics on violence at reproductive health facilities; (2) the well-publicized recent lethal eruptions of violence against physicians performing abortions; (3) threats made at Planned Parenthood by acquaintances of Dinwiddie to providers and recipients of reproductive health services; (4) an event on May 8, 1994 in which an unidentified person used a twelve-gauge shotgun to shoot into Crist's home; (5) an attempted arson of Planned Parenthood on December 15, 1994, after which Marge Herring, a picketer with Dinwiddie, told Gibson: "I might have been one of the ones involved in this;" (6) a phoned bomb threat to Planned Parenthood on January 12, 1995, six days after this Court issued the temporary restraining order; (7) the receipt by Crist's wife of a series of eleven unsolicited packages during the ten days prior to the first hearing on January 6, 1995 that, according to Federal Bureau of Investigation officials, could be a precursor to a bombing incident; and (8) at a hearing in the courtroom of Judge Vernon Scoville on January 28, 1994, Dinwiddie not only said "Patty Brous is the scum of all the people in this courtroom" but also sat in front of Brous and said to Brous: "Patty, you have not seen violence yet until you see what we do to you."

## 3. Facts

Plaintiffs have substantial evidence from the complaint, hearings, and pre-hearing written briefs indicating that Dinwiddie, who has protested against abortions for several years, has committed and is likely to continue committing actions prohibited by 18 U.S.C. § 248(a)(1). Planned Parenthood is unambiguously a reproductive health facility encompassed by FACE. Videotapes, witnesses, and victims all reveal that Dinwiddie harbors a serious intent to do bodily harm to the providers and recipients of reproductive health services. These facts can be categorized broadly under the rubrics: Dinwiddie's intentional use of threats of force to intimidate Crist; Dinwiddie's intentional use of threats of force to intimidate Brous and others working within Planned Parenthood; Dinwiddie's intentional use of force and threats of force to injure, intimidate, and attempt to interfere with other Planned Parenthood workers; Dinwiddie's intentional use of threats of force and physical obstruction to intimidate, interfere with, and attempt to interfere with clients exiting Planned Parenthood; and Dinwiddie's intentional use of threats of force to intimidate providers of reproductive health services in general and at Planned Parenthood.

### a. Crist

As described in the pre-hearing briefs and elicited at the first hearing, Dinwiddie has engaged in a consistent and threatening course of conduct aimed to intimidate Dr. Crist. For example, Dr. Crist, who performs abortions at Planned Parenthood and wears a bullet-proof vest specifically because of his fear of Dinwiddie, described: (1) an event on October 13, 1994 in which an unidentified man entered Planned Parenthood, threatened with the statement "unless the killing stops here, a lot of blood will be shed," exited Planned Parenthood, hugged and was hugged by Dinwiddie outside, and left via taxicab; (2) approximately fifty comments, many through the use of a bullhorn, by Dinwiddie directly to him over the past six to eight months warning "Robert, remember Dr. Gunn [the physician shot in Pensacola, Florida by an antiabortionist] ... This could happen to you.... He is not in the

world anymore.... Whoever sheds man's blood, by man his blood shall be shed;" and (3) various other direct and implied threats. Crist further testified that Dinwiddie spends a significant amount of time "with a bullhorn shouting derogatory comments, inflammatory comments, threatening comments at me, at Planned Parenthood, as we are preparing for and beginning to do abortion procedures."

### b. Brous

In addition to the threat from Dinwiddie to Brous in the courtroom of Judge Scoville, Brous testified that on December 29, 1994, soon after the death of Jackson County Judge Michael Coburn, Dinwiddie shouted through a bullhorn at Brous and others within Planned Parenthood: "God Almighty has struck down Judge Coburn and God will strike down other judges who support abortion rights."

When asked about Dinwiddie's use of the bullhorn outside Planned Parenthood, Brous testified that "the words that have been thrown, through the bullhorn or otherwise, at staff and patients have become much more violent. There is a higher level of stress. We have had to have counselors deal with the stress among the staff." Gibson's testimony elucidated the practical problems accompanying Dinwiddie's use of the bullhorn. Gibson, who is a public health officer who engages in inspections to enforce the local noise ordinance when someone complains, has been called to visit Planned Parenthood approximately every other week for at least the last four years.

Dinwiddie denied making inflammatory statements to Crist, Brous, and others about which there was completely credible testimony. Coons, Dinwiddie's mother, denied any knowledge of such comments. This Court is completely unpersuaded by the testimony of Dinwiddie and her mother. As noted by this Court in the temporary restraining order, both of these witnesses, by their testimony and their demeanor at the first hearing, demonstrated themselves to be zealots of at least occasionally questionable rationality and virtually no credibility.

### c. Workers

At the second hearing, plaintiffs presented testimony by Rich and Venable demonstrating that Dinwiddie's verbal threats have led to physical confrontations. Venable described an incident on July 28, 1994 in which Dinwiddie approached as he raked leaves adjacent to the outside fence of Planned Parenthood, said threatening comments, clenched her jaws, and swung an electronic bullhorn pinned against her hip into his body. Venable also testified that Dinwiddie made other threatening remarks indicating that her son, an ex-Marine, would come to Planned Parenthood to protect her. Venable's testimony was corroborated by Rich, who witnessed the confrontation and subsequently called Venable into Planned Parenthood out of concern for personal safety. As elicited at the second hearing, Jackson County Prosecutor Claire McCaskill filed on January 5, 1995 a charge of assault in the third degree against Dinwiddie for this confrontation. Dinwiddie admitted physical contact with Venable but asserted that she merely "tapped" him. This Court discredits Dinwiddie's testimony and finds Venable's testimony, as corroborated by Rich, to be much more credible. Moreover, whatever creative choice of words Dinwiddie uses to characterize this confrontation, she fails to dispel the fact that her threats led to a physical confrontation around the entrance of Planned Parenthood.

### d. Clients

Witnesses testified that Dinwiddie has also interfered with, intimidated, and physically obstructed persons seeking reproductive health services from Planned Parenthood. For example, Dinwiddie testified that "a young black girl went out of the abortion mill" on December 29, 1994. Dinwiddie followed closely and hollered at this girl exiting Planned Parenthood, who kicked Dinwiddie and, as admitted by Dinwiddie at the first hearing, told Dinwiddie to "get the f[uck] out of here" and "get away from me."

### e. Additional Intimidation and Threats of Force

All witnesses for plaintiffs indicated their beliefs that Dinwiddie has engaged in threatening or intimidating activity outside

Planned Parenthood since the enactment of FACE. For example, Gibson described Dinwiddie as an outspoken protestor who has used increasingly hostile attacking language. Additionally, the witnesses expressed their heightened concern for personal safety over the past six months. Witnesses also testified that Dinwiddie's intimidation and threatening comments through the use of her bullhorn have escalated steadily over time and that Dinwiddie has attempted to preclude persons from entering Planned Parenthood.

All these witnesses also indicated their awareness of Dinwiddie's well-publicized advocacy of lethal force. On many occasions, Dinwiddie has indicated a propensity to use lethal force. For example, Dinwiddie gained national attention at the sentencing of Paul Hill in Florida by Circuit Judge Frank Bell on December 6, 1994.[5] Additionally, Dinwiddie is one of twenty-five persons signing a petition circulated by Defensive Action, an antiabortion group directed by Hill that advocates the use of lethal force. This petition was entered as evidence at the first hearing and read in part:

> We, the undersigned, declare the justice of taking all godly action necessary to defend innocent human life including the use of force. We proclaim that whatever force is legitimate to defend the life of a born child is legitimate to defend the life of an unborn child. We assert that if Michael Griffin did in fact kill David Gunn, his use of lethal force was justifiable provided it was carried out for defending the lives of unborn children.

Before Brous received this petition via facsimile from the Planned Parenthood national office in New York on July 29, 1994, Planned Parenthood hired only one unarmed security guard at night. After circulation of the petition, Planned Parenthood hired a daytime guard and Brous requested armed guards twenty-fours hours per day.

Plaintiffs also presented a videotape of Dinwiddie's appearances on two local television programs on August 3, 1994 and January 3, 1995. During one program, Dinwiddie was asked whether it is "right to be able to kill a doctor to save that unborn child" and responded: "I think that abortion is a violent, violent business and that violence begets violence. The scriptures say that if you live by the sword, you die by the sword."

At the first hearing, the Court asked Dinwiddie whether she thinks it "is appropriate to shoot a doctor who is legally performing abortions." In response, Dinwiddie asserted her privilege against self incrimination under the Fifth Amendment. From that assertion, this Court draws the strong inference that the Dinwiddie does believe that such conduct is appropriate and therefore represents an imminent threat of harm or violence to society. It is not inappropriate for a court to draw such inferences in a civil proceeding.[6] At the second hearing, Dinwiddie's testimony failed to undo the inference.[7]

Finally, witnesses other than the defendant and her mother failed to add any credi-

---

**5.** At the sentencing of Hill, the first person sentenced to death under federal law for killing a doctor who performed abortions, Dinwiddie declared: " 'This man [Hill] is innocent,' she [Dinwiddie] shouted at the judge, 'and his blood will be on your hands, the hands of the people of the state of Florida and on the jury.' " Joe Maxwell, *His Call to Battle is Mostly Ignored*, CHI. TRIB., December 13, 1994, at C1. For this disruption, Dinwiddie was held without bond for three days. *Trial Demonstrator Set Free on Bond*, FT. LAUD. SUN-SENT., December 10, 1994, at 28A.

**6.** *See BE&K Constr. Co. v. NLRB*, 23 F.3d 1459, 1468 (8th Cir.1994); *Cerro Gordo Charity v. Fireman's Fund American Life Ins. Co.*, 819 F.2d 1471, 1480–81 (8th Cir.1987); *see also Aradia Women's Health Center v. Operation Rescue*, 929 F.2d 530, 532 (9th Cir.1991) (holding that con-

tempt proceeding against antiabortion protestors who blocked access to clinic was civil rather than criminal and district court was not required to refrain from drawing adverse inferences from protestors' refusal to testify on Fifth Amendment grounds).

**7.** Dinwiddie responded "no" to the question "are you advocating that abortion doctors should be shot" only after being pressed by this Court to answer directly. In viewing her demeanor during this line of questioning, the Court discredits the retraction. Even if Dinwiddie's response at the second hearing were construed to be a complete retraction of her invocation of the Fifth Amendment at the first hearing, this Court believes her first response, which occurred before she discovered the consequences of the temporary restraining order.

bility whatsoever to Dinwiddie's testimony.[8] This Court finds the testimony of Golden, Leake, and Meade to be unbelievable and worthy of absolutely no weight in defense counsel's attempt to establish Dinwiddie as a person with no tendency to advocate or potentially use lethal force in her crusade against abortion.

## B. Discovery

Defense counsel recently raised the issue that defendant was not allowed to conduct sufficient discovery. Although the Court addressed this issue in its order of February 24, 1995, which is incorporated into this permanent injunction, the Court reiterates that this argument is without merit.

The parties received three orders from this Court indicating that the deadline for written briefs and motions for the third hearing was February 24, 1995 at 9:30 a.m. Defendant filed a motion on February 23, 1995 at 10:30 a.m. for (1) continuance of permanent injunction hearing; and (2) extension of time for submission of briefs. The Court denied that motion on February 24, 1995.

Defense counsel's contention at the third hearing that additional discovery time was necessary is completely without merit. Over two months passed between the first hearing and the third hearing. Defendant's lack of significant discovery activity since the first hearing on January 6, 1995 belies the argument for additional discovery time. Defendant waited until February 21, 1995 at 6:16 p.m. to serve on plaintiffs a document entitled "First Set of Interrogatories, Request for Production, and Request for Admission" ("first set") and entered into evidence at the third hearing.

The first set, however, illustrates the spuriousness of this argument. The first set primarily seeks to obtain legal conclusions, protected internal documents, and items of public record.[9] Moreover, defense counsel has cross-examined plaintiffs' witnesses, could have deposed any person she desired to depose, could have recalled witnesses at any of the hearings, and had subpoena powers for the third hearing. Defendant cannot reasonably maintain that discovery was needed to prepare legal arguments on the constitutionality of FACE and has failed to show, having obtained full disclosure of plaintiffs' factual case, that additional discovery would have assisted her defense. Additional discovery would only have needlessly prolonged this case and would not have served any purpose underlying the enactment of the discovery provisions of the Federal Rules of Civil Procedure.[10]

## C. Buffer Zones
### 1. Judicial Discretion

The executive, legislative, and judicial branches of our government have recognized the gravity of the recent eruptions of violence around reproductive health facilities. Congress enacted FACE to protect public health and safety by prohibiting violence and threats of violence in circumstances such as those present here. Congress recognized that intimidation, threats, and physical confrontations such as those demonstrated by defendant cause harm not only to providers of services but also to patients who seek those services. Similarly, the Supreme Court has recognized that injunctive relief is important in order to ensure a woman's right to obtain a legal abortion, free public traffic flow, medical privacy, and public safety. *See Madsen v. Women's Health Center, Inc.,* ——

---

8. Golden, who knows Dinwiddie through her work on a radio talk show, merely asserted that he personally had never heard anything about her beliefs that were threatening. Leake merely testified as to the meaning of his placard. Meade, a friend of Dinwiddie for about ten years, was so contentious, combative, and unresponsive that any reasonable observer would conclude that his testimony was not credible.

9. For example, one interrogatory asks: "state and identify what is encompassed by FACE and what conduct constitutes conduct under FACE."

One request for production of documents asks: "produce and identify all briefs and pleadings filed by the Justice Department or its subdivisions in suits involving FACE." One request for admission asks: "admit that FACE applies only to conduct and not to speech."

10. *See* 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2001 (1973); JACK H. FRIEDENTHAL, MARY KAY KANE & ARTHUR R. MILLER, CIVIL PROCEDURE § 7.1 *et seq.* (1985).

U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Lower federal courts also have recognized the serious health effects imposed on patients by persons who terrorize providers. *See, e.g., Pro–Choice Network v. Project Rescue,* 799 F.Supp. 1417, 1427 (W.D.N.Y.1992). Finally, this Court notes several recent eruptions of lethal violence in the vicinity of reproductive health facilities protected by FACE, such as the murder of Dr. David Gunn in 1993 and the recent killings, in the context of facilities providing reproductive health services, of two persons in Massachusetts and two persons in Florida.

█ The Court has broad discretionary powers to craft an injunction to ensure that defendant complies with the law.[11] Carefully tailored injunctive relief not only is fair to the parties but also promotes the public interest. The evidence from the three hearings and the pre-hearing written briefs unambiguously shows that Dinwiddie has demonstrated a consistent, repetitious, and flagrant unwillingness or inability to comply with the legally-enacted provisions in FACE. Dinwiddie's actions have interfered in the past and are clearly intended to continue to interfere with women who seek to exercise their constitutionally protected right to seek

legal medical services.[12] The Court finds that injunctive relief against this defendant which creates a buffer zone around reproductive health facilities promotes the public interest and health and safety without doing violence to Dinwiddie's First Amendment rights.

In a variety of contexts, including facilities providing reproductive health services, other courts have recognized that certain circumstances justify the creation of buffer zones restricting specific defendants.[13] Although the nature and context of these injunctions differ, such cases embrace the principle that buffer zones around reproductive health facilities, such as Planned Parenthood clinics that fall within the ambit of FACE, do not foreclose alternative means of communication for protestors and present a narrowly tailored scheme that furthers the public interest in the health, safety, and life of providers and obtainers of reproductive health care services. Failure to grant a carefully tailored permanent injunction would not only jeopardize the lives and safety of persons receiving and engaging in reproductive health services, but also contravene the Constitutional mandate to federal courts to enforce statuto-

11. *EEOC v. Wilson Metal Casket Co.,* 24 F.3d 836 (6th Cir.1994); *see also Lemon v. Kurtzman,* 411 U.S. 192, 201, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) ("in equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests"); *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944) ("the essence of equity jurisdiction ... [is] to do equity and to mold each decree to the necessities of the particular case"); *George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1542 (2d Cir.1992) ("it is axiomatic that the contours of an injunction are shaped by the sound discretion of the trial judge"); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp. et al.,* 549 F.2d 368, 390 (5th Cir.1977) ("in fashioning relief against a party who has transgressed the governing legal standard, a court of equity is free to proscribe activities that, standing alone, would have been unassailable").

12. *See Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

13. *See, e.g., Madsen v. Women's Health Ctr., Inc.,* —— U.S. ——, ——, 114 S.Ct. 2516, 2529, 129

L.Ed.2d 593 (1994) (in context of reproductive health facility, upholding state court injunction establishing a 36–foot buffer zone and implying that a 300–foot buffer zone might be constitutional if there is evidence that protestor's speech is independently proscribable (i.e., "fighting words" or threats) or is so infused with violence as to be indistinguishable from a threat of physical harm); *Northeast Women's Ctr. Inc. v. McMonagle,* 939 F.2d 57, 65 (3d. Cir.1991) (in context of reproductive health facility, upholding an injunction prohibiting all but six picketers, designated by clothing or other devices, within 500 feet of entrance); *Pro–Choice Network v. Project Rescue,* 799 F.Supp. 1417, 1440 (W.D.N.Y.1992) (in context of reproductive health facility, establishing an injunction creating 15–foot zone around entrances and persons and vehicles seeking access); *Planned Parenthood v. Holy Angels Catholic Church,* 765 F.Supp. 617, 625 (N.D.Cal. 1991) (in context of reproductive health facility, imposing 25–foot zone around clinic entrance); *Planned Parenthood Shasta–Diablo, Inc. v. Williams,* 7 Cal.4th 860, 30 Cal.Rptr.2d 629, 873 P.2d 1224 (1994) (*en banc*) (in context of reproductive health facility, holding that injunction effectively barring protestors from public sidewalk in front of clinic did not violate protestors' First Amendment rights).

ry provisions such as FACE that are legally enacted by this nation's democratically elected representatives in Congress.

### 2. Scope

■■■■ As seen on pages 23 and 24, this permanent injunction consists of seven orders.

**Order (a)** grants plaintiffs' application for permanent injunction, as explained below.

**Order (b)** states that defendant shall not engage in any activity prohibited by 18 U.S.C. § 248.

**Order (c)** states that defendant shall not be physically located within 500 feet of the entrance of any facility (a "buffer zone") in the United States that provides reproductive health services as contemplated by 18 U.S.C. § 248. The geographical region encompassed by the permanent injunction is the United States. This Court possesses the authority to enforce a permanent injunction under FACE on a nationwide basis. "[T]here is no doubt that if the court has personal jurisdiction over the parties, it has the power to order each of them to act in any fashion or in any place" and has the power to enjoin a person from committing acts elsewhere. 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2945 (1973) at 402; *see Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 647 (2d Cir.) ("a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere"), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). The Court therefore will act pursuant to order (g) in the event defendant violates this permanent injunction at any location contemplated by 18 U.S.C. § 248, regardless of whether the location is Missouri, Kansas, or any other state.[14]

The evidence and nature of this case underscore the necessity of entering a permanent injunction, a negative or prohibitory order forbidding defendant from engaging in certain activity, on a nationwide scope. "Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender." *Berry v. Midtown Service Corp.*, 104 F.2d 107, 110–11 (2d Cir.1939). If the permanent injunction encompassed only Planned Parenthood or the Western District of Missouri, then this Court would jeopardize the lives and safety of providers and recipients of reproductive health services who are protected by FACE. Defendant could easily frustrate the purpose and spirit of the permanent injunction simply by stepping over state lines and engaging in identical or similar activity at another reproductive health facility.

**Order (d)** serves to tailor narrowly the sweep of the permanent injunction by creating an exception to order (c). Order (d) states that defendant may be physically located within 500 feet of the entrance of any facility in the United States that provides reproductive health services as contemplated by 18 U.S.C. § 248 solely for the purpose of engaging in legitimate personal activity that could not be remotely construed to violate 18 U.S.C. § 248. Although the Court will not enumerate the precise number and type of activities that would constitute legitimate personal activities, the two following sets of examples provide defendant with sufficient notice as to the scope of order (c) and the exception in order (d). Neither set of examples represents an exhaustive list.

Legitimate personal activity would include, for example, activity such as: (1) acquiring routine personal health services; (2) accompanying an immediate family member who is both in need of assistance and is acquiring health services; (3) receiving personal health services in an emergency situation; (4) shopping at a retail store or pharmacy adjacent to a reproductive health facility; (5) travelling within a buffer zone while engaged in activity

---

14. *See Leman v. Krentler–Arnold Hinge Last Co.*, 284 U.S. 448, 451, 52 S.Ct. 238, 239–40, 76 L.Ed. 389 (1932) (the mandate of an injunction issued by a federal district court runs nationwide); *Waffenschmidt v. Mackay*, 763 F.2d 711 (5th Cir.1985) (mandate of injunction issued by federal district court runs nationwide and viola-tion of injunctive order is cognizable in court that issued injunction regardless of where violation occurred); *Stiller v. Hardman*, 324 F.2d 626, 628 (2d Cir.1963) ("[v]iolation of an injunctive order is cognizable in the court which issued the injunction regardless of where the violation occurred").

unrelated to any service provided by a reproductive health facility; (6) peacefully carrying a placard in a manner that would not constitute intimidation, interference, or physical obstruction; (7) peacefully distributing literature in a manner that would not constitute intimidation, interference, or physical obstruction; or (8) unamplified speaking in a manner that would not constitute intimidation, interference, physical obstruction, or violation of a local noise ordinance.

Legitimate personal activity would not include, for example, activity that: (1) is described in part III.A. (i.e., pages 5 to 13) of this permanent injunction; (2) constitutes intimidation, physical obstruction, interference, force, or threats of force; (3) involves any use whatsoever of a bullhorn, megaphone, or other sound or voice amplifying device; (4) brings defendant in violation of any local noise ordinance; or (5) brings defendant in violation of laws related, but not limited, to assault, battery, trespass, harassment, vandalism, disturbing the peace, destruction of property, or unlawful possession of weapons, when such activity also has the effect of violating FACE. These activities are ones in which defendant has engaged in blatantly and repeatedly and are illegal, are related to her unlawful conduct, or are clearly within the types of activity contemplated by 18 U.S.C. § 248.[15]

The 500–foot radius of each buffer zone is not arbitrary. These buffer zones are tailored narrowly to the evidence presented in this case, which indicates that defendant's use of threats and intimidation in violation of FACE have been facilitated by the use of her bullhorn. Defendant has used her bullhorn not only to threaten and intimidate persons at Planned Parenthood, but also to assault physically workers such as Venable. A 500–foot buffer zone helps ensure that defendant will be precluded from engaging in such illegal activity. Other federal courts considering cases involving reproductive health facilities and workers have upheld buffer zones in which sound amplification was prohibited.[16]

**Order (e)** explicitly states the implicit message of order (c) and order (d): defendant shall not use order (d) as a pretext for engaging in activity prohibited by 18 U.S.C. § 248.

**Order (f)** notes that the permanent injunction does not require defendant to obtain prior approval from the Court in order to be present physically within a buffer zone as excepted in order (d). No prior approval for activity is required. Order (f) also states that if plaintiff complains of and proves any activity in violation of the permanent injunction, then defendant shall be prepared to explain such activity to the Court.

**Order (g)** provides notice to defendant that the Court stands ready to modify this permanent injunction by establishing absolute 500–foot buffer zones prohibiting any physical presence around reproductive health facilities if defendant violates any portion of this permanent injunction.

### 3. Constitutionality

Defendant argues that a permanent injunction is unconstitutional on several grounds. None of those arguments is persuasive.

---

**15.** *See, e.g., NLRB v. Express Pub. Co.,* 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941); *Nelson v. International Bhd. of Elec. Workers,* 899 F.2d 1557, 1564–65 (9th Cir.1990) (the proper scope of an injunction is to enjoin conduct that has been found to have been pursued or is related to the proven unlawful conduct).

**16.** *See, e.g., Madsen v. Women's Health Ctr., Inc.,* —— U.S. ——, ——, 114 S.Ct. 2516, 2528, 129 L.Ed.2d 593 (1994) (holding that state court injunction restricting noise by antiabortion protestors, including chanting, singing, yelling, shouting and the use of bullhorns or other sound amplification equipment, burdened no more speech than necessary to ensure health and well-being of patients and stating: "noise control is particularly important around hospitals and medical facilities during surgery and recovery periods"); *Northeast Women's Center, Inc. v. McMonagle,* 939 F.2d 57, 66 (3d Cir.1991) (holding that injunction restricting use by antiabortion activist of bullhorns or other sound amplification equipment within 2,500 feet of residence of any employees, staff, owners, or agents of women's health center was a reasonable restriction given nature and intrusiveness of sound amplification equipment); *Pro–Choice Network of Western New York v. Project Rescue Western New York,* 799 F.Supp. 1417, 1440 (W.D.N.Y.1992) (entering injunction restraining use of mechanical loudspeakers or sound amplification devices).

### a. Prior Restraint

An issue of first impression in the federal courts that was bypassed in *Woodall v. Reno*, 47 F.3d 656 (4th Cir.1995) is whether application of FACE's injunctive relief provisions represents a prior restraint on expression.[17] The time is ripe for consideration of this issue.

▇▇▇▇ A prior restraint is generally any governmental action that would prevent a communication from reaching the public. The drafters of the First Amendment sought to forbid any system of prior restraints under which nothing could be printed without government or church approval. *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), the classic case on prior restraints, articulates a heavy presumption against government action that prevents expression from occurring. The presumption, however, is not absolute. *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–34 (2d ed. 1988). One genre of impermissible prior restraint consists of judicial injunctions ordering a particular person not to engage in some type of communication. Today's permanent injunction issued against defendant, however, is not an unconstitutional prior restraint.

As this Court explained in the temporary restraining order and the preliminary injunction, FACE imposes content- and viewpoint-neutral restrictions on conduct and allows persons to engage in a full range of expressive activity. Likewise, this permanent injunction clearly allows defendant to express constitutionally protected activities. Defendant continues to enjoy her constitutional rights to expressive activities such as peaceful picketing, public speeches, literature distribution, telephone calling, and other solicitation of support. The permanent injunction is not based on any expressive content of the enjoined conduct. The orders in this permanent injunction are unambiguously less restrictive of protected speech than a neutral time, place, and manner regulation, a limitation that stands as a well-accepted exception to the prior restraint doctrine. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 1244–45, 43 L.Ed.2d 448 (1975). Moreover, *Madsen v. Women's Health Center, Inc.*, —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), indicates that such buffer zones in the context of reproductive health facilities do not represent a prior restraint on expression.[18]

### b. Other Issues

▇▇▇▇ Other arguments advanced by defendant are spurious, unpersuasive, or moot. The permanent injunction: (1) is not unconstitutionally vague, as a person of ordinary intelligence is not forced to guess as to its meaning. *See Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); (2) is not unconstitutionally overbroad and does not invade a constitutionally protected realm. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); (3) does not impermissibly target defendant's speech; and (4) does not result in any inequities that defense counsel attempted to articulate orally and to demonstrate with the list and the map at the third hearing.[19]

17. "[T]he time is not right for consideration of th[e prior restraint] issue. We have no factual record of an actual or threatened application of the Access Act's [FACE's] injunctive relief provisions. Moreover, we will not assume that a court would issue an injunction in violation of the well-established prior restraint doctrine.... [C]onsideration of this issue should be deferred until a more concrete controversy arises." *Woodall*, 47 F.3d at 658.

18. *Madsen* summarily rejected a claim that an injunction was a prior restraint because it was not imposed on the basis of the content of the enjoined parties' expression and stated: "petitioners are not prevented from expressing their message in any one of several different ways; they are simply prohibited from expressing it within the 36–foot buffer zone." *Madsen* at —— n. 2, 114 S.Ct. at 2524 n. 2; *see also Northeast Women's Center, Inc. v. McMonagle*, 939 F.2d 57, 63 (3d Cir.1991) (holding that injunction limiting extent to which antiabortion activist could demonstrate near women's health center was not an improper prior restraint on speech because it merely restricted the volume, location, timing, and violent or intimidating nature of expressive activity and made no mention whatsoever of abortion or any other substantive issue).

19. The Court admitted the list and the map with great skepticism and reluctance at the third hearing, noting that they represented opinion upon hearsay, or, hearsay upon hearsay. In light of the lack of foundation and the significant differences in the contours of the preliminary injunc-

Finally, the Court is aware that the constraints of this permanent injunction are spelled out in somewhat tedious detail and in a manner that is not customary in such orders. However, the Court is especially anxious that this permanent injunction be carefully, narrowly, and accurately tailored to the evidence and to this defendant. *See NLRB v. Express Pub. Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941) ("a federal court [may] restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past"); *supra* part III.C.1; *supra* note 15 and accompanying text.

Accordingly, it is ORDERED that:

(a) plaintiffs' application for permanent injunction is granted; and

(b) defendant shall not engage in any activity prohibited by 18 U.S.C. § 248; and

(c) defendant shall not be physically located within 500 feet of the entrance of any facility in the United States that provides reproductive health services as contemplated by 18 U.S.C. § 248; and

(d) there shall be an exception to order (c). Defendant may be physically located within 500 feet of the entrance of any facility in the United States that provides reproductive health services as contemplated by 18 U.S.C. § 248 solely for the purpose of engaging in legitimate personal activity, as explained in part III.C.2 of this permanent injunction, that could not remotely be construed to violate 18 U.S.C. § 248; and

(e) order (d) shall not be used by defendant as a pretext for engaging in activity prohibited by 18 U.S.C. § 248; and

(f) this permanent injunction does not require defendant to obtain prior approval from the Court in order to be present physically within a buffer zone. However, defendant shall be prepared to explain any activity within a buffer zone if plaintiffs complain and prove that she is or has been in violation of this permanent injunction; and

(g) in the event plaintiffs show that defendant has violated any portion of this permanent injunction, the Court shall hold defendant in contempt and stands ready to modify the permanent injunction by establishing absolute buffer zones prohibiting any physical presence around reproductive health facilities as contemplated by 18 U.S.C. § 248.

---

tion and this permanent injunction, the Court finds the evidence irrelevant.