_____

No. 95-1803WM
_____

United States of America,    *
                             *
        Appellee,            *
                             *  On Appeal from the United
   v.                        *  States District Court
                             *  for the Western District
                             *  of Missouri.
Regina Rene Dinwiddie,       *
                             *
        Appellant.           *

_____

Submitted:  November 13, 1995

Filed:  February 16, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, BRIGHT and FAGG, Circuit
    Judges.
_____

RICHARD S. ARNOLD, Chief Judge.


    Regina Rene Dinwiddie appeals from the District Court's order
finding that she violated the Freedom of Access to Clinic Entrances
Act of 1994, 18 U.S.C. § 248 ("FACE").  The order prohibits Mrs.
Dinwiddie from further violating FACE and from engaging in a number
of other activities whenever she is within 500 feet of a facility
that provides reproductive-health services.  See United States v.
Dinwiddie, 885 F. Supp. 1286 (W.D. Mo. 1995).  We affirm the
District Court's holding that FACE is constitutional and that Mrs.
Dinwiddie violated FACE, but remand to the District Court with
instructions to modify the injunction.

Regina Rene Dinwiddie is an opponent of abortion who, for many years, has protested outside of Planned Parenthood of Greater Kansas City ("Planned Parenthood"), a clinic where abortions are performed. The government filed a complaint against Mrs. Dinwiddie, alleging that she violated the Freedom of Access to Clinic Entrances Act, which provides criminal and civil penalties against anyone who:

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services.

18 U.S.C. § 248(a)(1).[1]  The District Court concluded that Mrs.

---

[1]FACE also provides penalties against anyone who:

> (2) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship; or

> (3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services, or intentionally damages or destroys the property of a place of religious worship.

18 U.S.C. § 248(a).

FACE contains the following definitions:

> (1) Facility.--The term "facility" includes a hospital, clinic, physician's office, or other facility that provides reproductive health

Dinwiddie violated FACE by obstructing, using physical force against, and threatening to use physical force against a number of Planned Parenthood's patients and members of its staff.

The Court found that Mrs. Dinwiddie directed particularly pointed threats at Dr. Robert Crist, a physician who is the Medical Director of Planned Parenthood. Over a six- to eight-month period beginning in mid-1994, the defendant made approximately 50 comments to Dr. Crist, often through a bullhorn, warning "Robert, remember Dr. Gunn [a physician who was killed in 1993 by an opponent of abortion] . . .. This could happen to you . . .. He is not in the world anymore . . .. Whoever sheds man's blood, by man his blood shall be shed . . .."

---

services, and includes the building or structure in which the facility is located.

(2) Interfere with.--The term "interfere with" means to restrict a person's freedom of movement.

(3) Intimidate.--The term "intimidate" means to place a person in reasonable apprehension of bodily harm to him- or herself or to another.

(4) Physical obstruction.--The term "physical obstruction" means rendering impassable ingress to or egress from a facility that provides reproductive health services or to or from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous.

(5) Reproductive health services.--The term "reproductive health services" means reproductive health services provided in a hospital, clinic, physician's office, or other facility, and includes medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy.

18 U.S.C. § 248(e).

-3-

The District Court also determined that Mrs. Dinwiddie threatened and, on one occasion, used physical force against other members of Planned Parenthood's staff and some of its patients. On January 28, 1994, the defendant said to Patricia Brous, the Executive Director of Planned Parenthood, "Patty, you have not seen violence yet until you see what we do to you." According to Ms. Brous, whose testimony the Court found credible, "the words that have been thrown, through the bullhorn or otherwise, at staff and patients have become much more violent. There is a higher level of stress. We have had to have counselors deal with stress among the staff." On July 28, 1994, Mrs. Dinwiddie physically assaulted Lenard Venable, a Maintenance Supervisor at Planned Parenthood, with an electric bullhorn. Also, she physically obstructed potential patients from entering the clinic.

Dr. Crist, Ms. Brous, and other members of Planned Parenthood's staff testified that Mrs. Dinwiddie's conduct has caused them to fear for their personal safety. Dr. Crist stated that because of his fear of the defendant, he now wears a bullet-proof vest. Planned Parenthood has responded to Mrs. Dinwiddie by placing an armed guard at its front door.

Finally, the District Court noted that Mrs. Dinwiddie is a well-known advocate of the viewpoint that it is appropriate to use lethal force to prevent a doctor from performing abortions.[2]

---

[2]Mrs. Dinwiddie signed a petition defending Michael Griffin, who was convicted of killing Dr. David Gunn. In part, the petition states:

> We, the undersigned, declare the justice of taking all godly action necessary to defend innocent human life including the use of force. We proclaim that whatever force is legitimate to defend the life of a born child is legitimate to defend the life of an unborn child. We assert that if Michael Griffin did in fact kill David Gunn, his use of lethal force was justifiable provided it was carried out for defending the lives of unborn children.

-4-

Citing this viewpoint and Mrs. Dinwiddie's conduct towards Planned Parenthood's staff and patients, the Court determined that the defendant is likely to continue to violate FACE and is an imminent threat to public safety.

The District Court issued a permanent injunction that orders Mrs. Dinwiddie not to violate FACE and "not [to] be physically located within 500 feet of the entrance of any facility (a `buffer zone') in the United States that provides reproductive health services as contemplated by [FACE]." 885 F. Supp. at 1296. There is an exception to this 500-foot buffer zone. Mrs. Dinwiddie may be "physically located within 500 feet of the entrance of any facility in the United States that provides reproductive health services as contemplated by [FACE] solely for the purpose of engaging in legitimate personal activity that could not be remotely construed to violate [FACE]." Ibid. The Court then provided examples of what constitutes "legitimate personal activity":

> Legitimate personal activity would include, for example, activity such as: (1) acquiring routine personal health services; (2) accompanying an immediate family member who is both in need of assistance and is acquiring health services; (3) receiving personal health services in an emergency situation; (4) shopping at a retail store or pharmacy adjacent to a reproductive health facility; (5) travelling within a buffer zone while engaged in activity unrelated to any service provided by a reproductive health facility; (6) peacefully carrying a placard in a manner that would not constitute intimidation, interference, or physical obstruction; (7) peacefully distributing literature in a manner that would not constitute intimidation, interference, or physical

Mrs. Dinwiddie has expressed similar sentiments on other occasions. For instance, on a television program, Mrs. Dinwiddie was asked whether it is "right to be able to kill a doctor to save that unborn child." She responded: "I think that abortion is a violent, violent business and that violence begets violence. The Scriptures say that if you live by the sword, you die by the sword." Such statements are protected under the First Amendment, but they may also be relevant to show that other statements could reasonably be understood as threats of physical harm.

obstruction; or (8) unamplified speaking in a manner that would not constitute intimidation, interference, physical obstruction, or violation of a local noise ordinance.

Legitimate personal activity would not include, for example, activity that: (1) is described in part III.A. [i.e. 885 F. Supp. at 1290-94] of this permanent injunction; (2) constitutes intimidation, physical obstruction, interference, force, or threats of force; (3) involves any use whatsoever of a bullhorn, megaphone, or other sound or voice amplifying device; (4) brings defendant in violation of any local noise ordinance; or (5) brings defendant in violation of laws related, but not limited, to assault, battery, trespass, harassment, vandalism, disturbing the peace, destruction of property, or unlawful possession of weapons, when such activity also has the effect of violating FACE.

Id. at 1296-97.[3]

Mrs. Dinwiddie raises several arguments on appeal. First, she argues that FACE is unconstitutional. Second, Mrs. Dinwiddie asserts that she did not violate FACE. Finally, she claims that the permanent injunction is vague and overbroad.

II.

Mrs. Dinwiddie contends that FACE is unconstitutional because Congress lacked the authority to enact FACE and because FACE violates the Free Speech Clause of the First Amendment. We hold that FACE is within Congress's commerce power and is not facially inconsistent with the First Amendment.

A.

The Constitution grants to Congress the power "[t]o regulate

---

[3]The District Court subsequently found that Mrs. Dinwiddie violated the permanent injunction and was guilty of civil contempt of court. United States v. Dinwiddie, 885 F. Supp. 1299 (W.D. Mo. 1995). The contempt order is not before us on this appeal.

Commerce . . . among the several States . . .." U.S. Const., Art. I, § 8, cl. 3. Congress may use this commerce power: to regulate the channels of interstate commerce, to regulate or protect the instrumentalities of interstate commerce or people or things involved in interstate commerce, and to regulate conduct that has a substantial effect on interstate commerce. United States v. Lopez, 115 S. Ct. 1624, 1629-30 (1995). FACE falls within both the second and third of these categories of commerce power.

1.

The Commerce Clause permits Congress to "protect . . . persons or things in interstate commerce, even though the threat may come only from intrastate activities." Id. at 1629. See Perez v. United States, 402 U.S. 146, 150 (1971) (Congress may prohibit thefts from interstate shipments); United States v. Coombs, 12 Pet. 72, 77 (1838) (Congress may punish conduct that "interferes with, obstructs or prevents" interstate commerce). Thus, if Planned Parenthood of Greater Kansas City, its staff, or its patients are "in interstate commerce," FACE's protection of them from Mrs. Dinwiddie's disruptive activities is a valid exercise of the commerce power.

Planned Parenthood has a number of patients and staff who do not reside in Missouri and who, therefore, engage in interstate commerce when they obtain or provide reproductive-health services. Substantial numbers of women travel across state lines to obtain reproductive-health services. S. Rep. No. 117, 103d Cong., 1st Sess. 13-14, 31 (1993); Bray v. Alexandria Women's Health Clinic, 113 S. Ct. 753, 792 (1993) (Stevens, J., dissenting) (between 20 and 30 per cent. of patients at a Virginia abortion clinic were from outside Virginia, and a majority of a Maryland clinic's patients were from outside Maryland); Women's Health Care Services v. Operation Rescue, 773 F. Supp. 258, 266-67 (D. Kan. 1991), rev'd on other grounds, 24 F.3d 107 (10th Cir. 1994) (between 8 and 10

-7-

per cent. of the patients at one Wichita, Kansas, clinic were from outside of Kansas, and 44 per cent. from another Wichita clinic were from out of state). The interstate nature of Planned Parenthood's clientele is particularly evident because Planned Parenthood is located in a metropolitan area that encompasses more than one state. Also, some of Planned Parenthood's staff are not from Missouri. Dr. Crist, for example, resides in Overland Park, Kansas.

In addition to having the power to protect those of Planned Parenthood's staff and patients who are "in interstate commerce," Congress also has the power to protect Planned Parenthood. A business is in interstate commerce when it "directly engage[s] in the production, distribution, or acquisition of goods or services in interstate commerce." United States v. American Building Maintenance Industries, 422 U.S. 271, 283 (1975). See United States v. Robertson, 115 S. Ct. 1732 (1995) (per curiam) (an Alaskan gold mine that hired seven out-of-state employees and purchased equipment from an out-of-state supplier was engaged in interstate commerce and subject to regulation under RICO, a statute enacted under Congress's commerce power). Because Planned Parenthood has out-of-state staff and patients, it is "in interstate commerce" and is within Congress's power to protect.

In sum, FACE's protection of Planned Parenthood and its staff and patients is a valid exercise of Congress's power to protect people and businesses involved in interstate commerce.

2.

In addition to empowering Congress to protect persons and things in interstate commerce, the Commerce Clause also gives Congress the authority to regulate "those activities that substantially affect interstate commerce." Lopez, 115 S. Ct. at 1630 (citations omitted). Under this power, Congress may regulate

a class of purely intrastate activity if, in the aggregate, the activity has a substantial effect on interstate commerce.  Ibid.; Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258 (1964); Wickard v. Filburn, 317 U.S. 111, 125 (1942).  Furthermore, "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power `to excise, as trivial, individual instances' of the class."  Perez, 402 U.S. at 154 (quoting Maryland v. Wirtz, 392 U.S. 183, 193 (1968)).

In determining whether the conduct prohibited by FACE had a substantial effect on interstate commerce, our scope of review is limited.  We must decide "whether a rational basis existed for concluding that [the] regulated activity sufficiently affected interstate commerce."  Lopez, 115 S. Ct. at 1629.  The House Judiciary Committee and the Senate Labor and Human Resources Committee gathered evidence showing that the blockading of clinics and the use of violence and threats of violence against clinics' patients and staff depressed interstate commerce in reproductive-health services.  H.R. Rep. No. 306, 103d Cong., 2d Sess. 8-9 (1993), reprinted in 1994 U.S. Code Cong. & Admin. News 699, 705-06; S. Rep. No. 117, at 31-32.  It is settled law that the Commerce Clause gives Congress the power to regulate activity that diminishes interstate commerce in a good or service.  See, e.g., Katzenbach v. McClung, 379 U.S. 294, 299-300 (1964) (Congress may regulate discrimination in restaurant services because, among other things, this discrimination reduces the amount of food purchased by restaurants); Wickard, 317 U.S. at 128-29 (the growing of wheat for home consumption reduces wheat sales and is, therefore, within the commerce power).  Thus, there is a rational basis for concluding that the conduct prohibited by FACE substantially affects interstate commerce.

Mrs. Dinwiddie advances two arguments against this line of reasoning.  Her first argument is drawn from United States v.

Wilson, 880 F. Supp. 621 (E.D. Wis. 1995), rev'd, No. 95-1871, 1995 WL 765450 (7th Cir. Dec. 29, 1995), which, though it has now been reversed, is the only opinion holding that FACE is not within Congress's commerce power. In Wilson, the district court reasoned that FACE is unconstitutional because "FACE does not regulate commercial entities, but rather regulates private conduct affecting commercial entities which in turn receive goods that have traveled in interstate commerce." Id. at 628. We disagree. As the Seventh Circuit explained, "[t]here is no authority for the proposition that Congress's power extends only to the regulation of commercial entities." Wilson, 1995 WL 765450 at *9. See, e.g., National Organization for Women, Inc. v. Scheidler, 114 S. Ct. 798, 803-06 (1994) (racketeering activity by a non-commercial enterprise can have a sufficient effect on interstate commerce so as to be punishable under RICO, a statute based on the Commerce Clause); Stirone v. United States, 361 U.S. 212, 215 (1960) (the Hobbs Act, which provides criminal and civil penalties against anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . or [by] commit[ting] or threaten[ing] physical violence to any person or property . . .," 18 U.S.C. § 1951(a), is within Congress's commerce power).

Next, Mrs. Dinwiddie asserts that holding FACE to be within Congress's commerce power would be inconsistent with United States v. Lopez, the Supreme Court's most recent decision interpreting the Commerce Clause. In Lopez, the Supreme Court held that the Gun-Free School Zones Act, which prohibited possession of a firearm in the vicinity of a school, see 18 U.S.C. § 922(q)(1)(A), was not a valid exercise of Congress's commerce power. The government had asserted that the possession of a gun in a school zone leads to lower national productivity and, thus, less interstate commerce. The Court rejected this argument, finding that it would require the Court to "pile inference upon inference" to conclude that the conduct prohibited by the Gun-Free School Zones Act had a

substantial effect on interstate commerce.  <u>Lopez</u>, 115 S. Ct. at 1634.

For two reasons, we believe that <u>Lopez</u> does not call on us to hold that FACE is beyond Congress's power to regulate activity that substantially affects interstate commerce.  First, unlike the Gun-Free School Zones Act, FACE prohibits interference with a commercial activity -- the provision and receipt of reproductive-health services.  <u>Cf.</u> <u>id.</u> at 1633 (education is not a commercial activity).  FACE does not require us to "pile inference upon inference" to conclude that the conduct that it proscribes affects interstate commerce.  As the House and Senate committee reports show, the causal link is quite direct --- when people interfere with a business, the availability of the service provided by that business declines.  Second, in <u>Lopez</u>, the Supreme Court did not overturn <u>Katzenbach v. McClung</u>, <u>Wickard v. Filburn</u>, or any other opinion holding that Congress has the power to regulate conduct that reduces interstate commerce in a good or service.  See <u>Lopez</u>, 115 S. Ct. at 1637 (Kennedy, J., concurring) (<u>Katzenbach</u>, <u>Wickard</u>, and other post-New Deal cases "are within the fair ambit of the Court's practical conception of commercial regulation and are not called into question by our decision today").  Therefore, <u>Lopez</u> notwithstanding, FACE is a valid exercise of Congress's power to regulate activity that substantially affects interstate commerce.[4]

B.

Mrs. Dinwiddie next contends that the Freedom of Access to Clinic Entrances Act facially violates the Free Speech Clause of

_____

[4]<u>Accord</u>, <u>Wilson</u>, 1995 WL 765450 at *7-*13; <u>Cheffer v. Reno</u>, 55 F.3d 1517, 1520-21 (11th Cir. 1995); <u>United States v. Lucero</u>, 895 F. Supp. 1421, 1423-24 (D. Kan. 1995); <u>United States v. White</u>, 893 F. Supp. 1423, 1432-34 (C.D. Cal. 1995).  Because we hold that FACE is within Congress's commerce power, we need not consider the government's argument that Congress also had the authority to enact FACE under Section Five of the Fourteenth Amendment.

the First Amendment. She asserts that FACE imposes an impermissible content-based restriction on speech, and that it is both vague and overbroad. We hold that FACE is not content based, and that it easily satisfies the intermediate-scrutiny test that applies to content-neutral laws that burden expressive conduct. We also conclude that FACE is neither vague nor overbroad.

1.

A statute that regulates speech or conduct "based on hostility -- or favoritism -- towards the underlying message expressed" is content based. R.A.V. v. St. Paul, 505 U.S. 377, 386 (1992). Generally, a content-based statute is unconstitutional unless it survives strict scrutiny, which requires the government to prove that the statute "`is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" Whitton v. City of Gladstone, 54 F.3d 1400, 1408 (8th Cir. 1995) (quoting Perry Ed. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)). Mrs. Dinwiddie asserts that FACE is content based and should be subject to strict scrutiny.

FACE criminalizes three types of activity -- the use of "force," "threat[s] of force," and "physical obstruction." See 18 U.S.C. § 248(a). Mrs. Dinwiddie does not contest the fact that both physical obstruction and the use of force are unprotected by the First Amendment. See Wisconsin v. Mitchell, 113 S. Ct. 2194, 2199 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment."); Cameron v. Johnson, 390 U.S. 611, 615-17 (1968) (rejecting a First Amendment challenge to a law that prohibits obstructing access to a courthouse). Instead, Mrs. Dinwiddie focusses on FACE's prohibition on using a "threat of force" to "intimidate" a person because she is obtaining or providing reproductive-health services. According to the defendant, proscribing threats of force that "intimidate," which FACE defines as to "place a person in

-12-

reasonable apprehension of bodily harm," 18 U.S.C. § 248(e)(3), imposes a content-based restriction on speech because it punishes the speech based on its communicative impact.

Mrs. Dinwiddie is correct that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 125, 134 (1992). See, e.g., Texas v. Johnson, 491 U.S. 397, 412 (1989) (a statute prohibiting flag desecration was content based because it punished speech based on the "emotive impact of [the] speech on its audience . . .." (quoting Boos v. Berry, 485 U.S. 312, 321 (1988)). But this reasoning does not apply to statutes that outlaw threats of violence. It is "well settled that threats of violence are . . . unprotected speech." United States v. J.H.H., 22 F.3d 821, 825 (8th Cir. 1994). See R.A.V., 505 U.S. at 388 ("threats of violence are outside the First Amendment"); Watts v. United States, 394 U.S. 705, 707 (1969) (per curiam) (holding that a statute that criminalizes threats to the President is constitutional on its face and distinguishing "a threat . . . from what is constitutionally protected speech"). Accordingly, we have upheld the facial validity of a number of statutes that, using language similar to FACE's, prohibit threats of violence. See, e.g., J.H.H., 22 F.3d at 824-26 (upholding 42 U.S.C. § 3631, which prohibits "threats of force" that "intimidate" a person because of his race and because he is participating in certain housing programs); United States v. Lee, 6 F.3d 1297, 1302-04 (8th Cir. 1993) (en banc) (John R. Gibson, J., concurring) (18 U.S.C. § 241, which prohibits conspiracies to "injure, oppress, threaten, or intimidate" a person because he is exercising a federal right, is facially constitutional and can be applied to conduct that causes a person "reasonably [to] fear the use of imminent force or violence"), cert. denied, 114 S. Ct. 1550 (1994); United States v. Bellrichard, 994 F.2d 1318, 1321-25 (8th Cir.) (18 U.S.C. § 876, which prohibits mailing a letter that contains a "threat to injure" the addressee, is constitutional), cert. denied, 114 S. Ct. 337 (1993). Thus,

-13-

rather than imposing a content-based restriction on speech, FACE's proscription of "threats of force" that "place a person in reasonable apprehension of bodily harm" regulates speech that is not protected by the First Amendment.[5]

Next, Mrs. Dinwiddie takes aim at FACE's motive requirement, which limits the statute's application to those who engage in proscribed conduct "because [the victim] is or has been, or in order to intimidate [the victim] from, obtaining or providing reproductive health services . . .." 18 U.S.C. § 248(a)(1). According to the defendant, this motive requirement selects for punishment abortion-related expressive conduct and, therefore, transforms FACE into a content-based statute. We disagree.

In order for a statute to be facially content based, it must discriminate in favor of or against the message conveyed by speech or conduct. FACE's motive requirement does not discriminate against speech or conduct that expresses an abortion-related message. FACE would, for example, apply to anyone who blockades a clinic to prevent a woman from getting an abortion, regardless of the message expressed by the blockade. Thus, FACE would prohibit striking employees from obstructing access to a clinic in order to stop women from getting abortions, even if the workers were

---

[5]Mrs. Dinwiddie also argues that FACE runs afoul of <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969) (per curiam), which holds that the government may punish the advocacy of illegal conduct only "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." <u>Id.</u> at 447. See also <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 886, 928 (1982) (statements advocating violence were protected by the First Amendment because they were not "directed to inciting or producing imminent lawless action" and were not "likely to incite or produce such action"). According to Mrs. Dinwiddie, FACE is flawed because it does not require that a threat place the listener in <u>imminent</u> fear of harm. We disagree. The <u>Brandenburg</u> test applies to laws that forbid inciting someone to use violence against a third party. It does not apply to statutes, like FACE, that prohibit someone from directly threatening another person.

-14-

carrying signs that said, "We are underpaid!" rather than "Abortion is wrong!"  Cf. Police Department of Chicago v. Mosley, 408 U.S. 92 (1972) (invalidating a law that banned picketing within 150 feet of a school but exempted labor picketing).[6]

What FACE's motive requirement accomplishes is the perfectly constitutional task of filtering out conduct that Congress believes need not be covered by a federal statute.  Congress enacted FACE to prohibit conduct that interferes with the ability of women to obtain abortions.  See H.R. Rep. No. 306, at 12; S. Rep. No. 117, at 24.  FACE's motive requirement targets this conduct while ensuring that FACE does not federalize a slew of random crimes that might occur in the vicinity of an abortion clinic.  Congress's use of a motive requirement to single out conduct that "is thought to inflict greater individual or societal harm," Mitchell, 113 S. Ct. at 2201, is quite common.  For example, Title VII of the 1964 Civil Rights Act forbids an employer from discriminating against an employee "because of [the employee's] race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  See Mitchell, 113 S. Ct. at 2200-01 (discussing the constitutionality of Title VII's motive requirement and upholding a statute that enhances sentences for crimes motivated by racial bias).[7]

Finally, Mrs. Dinwiddie argues that even if FACE appears to be content neutral, it is, in fact, content based because the vast majority of people whose conduct it proscribes are opposed to

---

[6]Indeed, FACE also applies to conduct that interferes with religious services conducted in a place of worship.  See 18 U.S.C. § 248(a)(2).

[7]Mrs. Dinwiddie contends that motive may be used only as a sentencing consideration and not as an element in a civil action or criminal offense.  We disagree.  If Mrs. Dinwiddie were correct, Title VII would be unconstitutional.  But Title VII is a constitutional, content-neutral statute.  Mitchell, 113 S. Ct. at 2200.

-15-

abortion. But there is no disparate-impact theory in First Amendment law. The fact that a statute, whether through a motive requirement or some other mechanism, disproportionately punishes those who hold a certain viewpoint does not "itself render the [statute] content or viewpoint based." Madsen v. Women's Health Center, Inc., 114 S. Ct. 2516, 2524 (1994). See, e.g., United States v. O'Brien, 391 U.S. 367 (1968) (upholding a law that prohibited the destruction of draft cards even though most people who burned their draft cards were opponents of the Vietnam War). Thus, we reject Mrs. Dinwiddie's argument and hold that FACE is a content-neutral law.

2.

Although FACE is content neutral and, therefore, need not survive strict scrutiny, it does "incidentally affect some conduct with protected expressive elements, such as peaceful but obstructive picketing." American Life League v. Reno, 47 F.3d 642, 648 (4th Cir.), cert. denied, 116 S. Ct. 55 (1995). When a content-neutral law burdens expressive conduct, we must subject the law to intermediate scrutiny. A statute survives intermediate scrutiny "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377. FACE easily passes this test.

FACE furthers the government's interest in protecting women who obtain reproductive-health services and ensuring that reproductive-health services remain available. See H.R. Rep. No. 306, at 6; S. Rep. No. 117, at 14-17. These interests are significant, see Madsen, 114 S. Ct. at 2526; Pro-Choice Network of Western New York v. Schenck, 67 F.3d 377, 387 (2d Cir. 1995) (en banc), and are not related to restricting free speech. Also, FACE

-16-

regulates only uses of force, threats of force, and physical obstruction. Thus, it "leaves open ample alternative means for communication," American Life League, 47 F.3d at 652, and is narrowly tailored to further the government's interests. The statute forbids physical interference with people going about their own lawful private business. It is difficult to conceive of any such statute that could not survive this level of scrutiny.

3.

We now consider Mrs. Dinwiddie's claim that FACE is overbroad and vague. A statute is unconstitutionally overbroad if "it reaches a substantial number of impermissible applications." New York v. Ferber, 458 U.S. 747, 771 (1982). As we have discussed, FACE prohibits only a limited range of activity. It is not even close to being overbroad. See Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973) (invalidating a statute on overbreadth grounds is "strong medicine" that must be applied "sparingly and only as a last resort").

To "survive a vagueness challenge, a statute must `give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and `provide explicit standards for those who apply [the statute].'" Video Software Dealers Ass'n v. Webster, 968 F.2d 684, 689 (8th Cir. 1992) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). Mrs. Dinwiddie asserts that FACE is impermissibly vague because it uses the following terms: "interfere with," "physical obstruction," "intimidate," "force or threat of force," and "injures."

The meaning of these terms is quite clear. In Cameron v. Johnson, the Supreme Court rejected a vagueness challenge levelled against a statute that prohibited engaging in "picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress to or egress from any public

-17-

premises . . .." 390 U.S. at 612 n.1 (emphasis added). The meanings of "interfere with" and "physical obstruction" are even clearer in FACE because, unlike the statute at issue in Cameron, FACE provides narrow definitions of these terms. See 18 U.S.C. § 248(e)(2) and (4). As for "force or threat of force" and "injures," they are readily understandable terms that are used in everyday speech. Finally, considering that FACE defines "intimidate" as "to place a person in reasonable apprehension of bodily harm," 18 U.S.C. § 248(e)(3), "intimidate" is a clear term that is similar to an element in the crime and tort of assault. See, e.g., Mo. Rev. Stat. § 565.070(3) (a person commits the crime of third-degree assault if "[h]e purposely places another person in apprehension of immediate physical injury"); Restatement (Second) of Torts § 21 (1965) (defining the tort of assault as placing a person in imminent apprehension of "harmful or offensive contact" with the intention of doing so).

Therefore, we reject Mrs. Dinwiddie's overbreadth and vagueness arguments and, like every other court that has considered the question, conclude that FACE does not violate the First Amendment.[8]

III.

Having held that FACE is constitutional, we now address Mrs. Dinwiddie's argument that she did not violate the statute. Although the District Court found that Mrs. Dinwiddie ran afoul of FACE in numerous ways, see 885 F. Supp. at 1291-94, it emphasized Mrs. Dinwiddie's use of "threats of force" to "intimidate" Dr.

_____

[8]Accord, Cheffer, 55 F.3d at 1521-22; American Life League, 47 F.3d at 648-53; Lucero, 895 F. Supp. at 1424-25; White, 893 F. Supp. at 1435-37; Riely v. Reno, 860 F. Supp. 693, 700-04 (D. Ariz. 1994); Cook v. Reno, 859 F. Supp. 1008, 1010-11 (W.D. La. 1994); Council for Life Coalition v. Reno, 856 F. Supp. 1422, 1426-30 (S.D. Cal. 1994).

Crist, Planned Parenthood's Medical Director.  We therefore begin by discussing the definition of "threats of force."

A.

Although the government may outlaw threats, see ante at 13-14, the First Amendment does not permit the government to punish speech merely because the speech is forceful or aggressive.  What is offensive to some is passionate to others.  The First Amendment, therefore, requires a court (or a jury) that is applying FACE's prohibition on using "threats of force," to differentiate between "true threat[s]," Watts, 394 U.S. at 708, and protected speech. The court must analyze an alleged threat "in the light of [its] entire factual context," Lee, 6 F.3d at 1306 (Lay, J., concurring in part and dissenting in part), and decide whether the recipient of the alleged threat could reasonably conclude that it expresses "a determination or intent to injure presently or in the future." Martin v. United States, 691 F.2d 1235, 1240 (8th Cir. 1982), cert. denied, 459 U.S. 1211 (1983).

When determining whether statements have constituted threats of force, we have considered a number of factors:  the reaction of the recipient of the threat and of other listeners, see J.H.H., 22 F.3d at 827; whether the threat was conditional, see Bellrichard, 994 F.2d 1321; whether the threat was communicated directly to its victim, see ibid.; whether the maker of the threat had made similar statements to the victim in the past, see United States v. Whitfield, 31 F.3d 747, 749 (8th Cir. 1994); and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.  See ibid.  This list is not exhaustive, and the presence or absence of any one of its elements need not be dispositive.  See, e.g., Bellrichard, 994 F.2d at 1322 ("A threat may be considered a `true threat' even if it is premised on a contingency.").

-19-

We will now examine Mrs. Dinwiddie's statements to Dr. Crist. The District Court found that from mid-1994 through early 1995, the defendant made approximately 50 comments to Dr. Crist, often through a bullhorn, warning "Robert, remember Dr. Gunn . . . . This could happen to you . . .. He is not in the world anymore . . .. Whoever sheds man's blood, by man his blood shall be shed." We agree with the District Court that these statements were "threats of force," and that they violated FACE by "intimidating" Dr. Crist (<u>i.e.</u>, placing Dr. Crist in "reasonable apprehension of bodily harm").

Although Mrs. Dinwiddie did not specifically say to Dr. Crist, "I am going to injure you," the manner in which Mrs. Dinwiddie made her statements, the context in which they were made, and Dr. Crist's reaction to them all support the conclusion that the statements were "threats of force" that "intimidated" Dr. Crist.[9] Mrs. Dinwiddie made these statements not once or twice, but about 50 times. She communicated them directly to Dr. Crist, who reacted to them by wearing a bullet-proof vest. Finally, Dr. Crist was aware that Mrs. Dinwiddie, a well-known advocate of the view that it is justifiable to use lethal force against doctors who perform abortions, had attacked Lenard Venable, a Maintenance Supervisor at Planned Parenthood, physically obstructed potential patients who were trying to enter Planned Parenthood, and, on January 28, 1994, told Patty Brous, Planned Parenthood's Executive Director, "Patty, you have not seen violence yet until you see what we do to you." These facts gave Dr. Crist reason to believe that Mrs. Dinwiddie had a propensity to use force.[10]

_____

[9]The fact that Mrs. Dinwiddie did not specifically say to Dr. Crist that <u>she</u> would injure him does not mean that Mrs. Dinwiddie's comments were not "threats of force." See, <u>e.g.</u>, <u>Bellrichard</u>, 994 F.2d at 1319-24 (holding that a number of letters warning their addressees that God or a third party would kill them were threats).

[10]Mrs. Dinwiddie argues that because her comment to Ms. Brous occurred before May 26, 1994, the date FACE took effect, the

Our conclusion that Mrs. Dinwiddie's statements were "threats of force" that "intimidated" Dr. Crist is supported by Watts v. United States, a case on which Mrs. Dinwiddie heavily relies. At issue in Watts was the defendant's statement at a rally that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." Watts, 394 U.S. at 706. The Supreme Court reversed Watts's conviction for threatening the President because Watts's statement was expressly conditioned on his induction into the Armed Forces and because the audience responded to Watts by laughing. See id. at 707-08. In contrast, Mrs. Dinwiddie's comments were not expressly conditional. Dr. Crist did not laugh at the defendant's words; he started wearing a bullet-proof vest. Finally, whereas Watts did not communicate his comment directly to President Johnson, Mrs. Dinwiddie used a bullhorn to speak directly to Dr. Crist. In sum, Mrs. Dinwiddie's words were far more

---

District Court's reliance on it was erroneous. It is true that Mrs. Dinwiddie cannot be held liable under FACE for conduct that occurred prior to May 26, 1994. See Section 6 of Pub. L. No. 103-259, 108 Stat. 694, 697 (1994) (statutory note accompanying FACE). But that is not what the District Court did. The Court stated, correctly, that although Mrs. Dinwiddie's pre-May 26, 1994 conduct and background events not linked directly to Mrs. Dinwiddie "do not bear directly on the liability of Dinwiddie under FACE, they are relevant to the definitions in 18 U.S.C. § 248(e)." 885 F. Supp. at 1291. In other words, although Mrs. Dinwiddie's comment to Ms. Brous does not violate FACE, it can be used as a factor in determining whether her post-May 26, 1994, comments to Crist were "threats of force" that "intimidated" Crist by placing him in "reasonable apprehension of physical harm."

The same reasoning applies to Mrs. Dinwiddie's advocacy of the view that it is justifiable to use violence against doctors who perform abortions. Punishing Mrs. Dinwiddie for expressing this opinion would violate the First Amendment. See Brandenburg, 395 U.S. at 447. But it was appropriate for the District Court to consider Crist's "awareness of Dinwiddie's well-publicized advocacy of lethal force," 885 F. Supp. at 1293, in determining whether Mrs. Dinwiddie intimidated him with threats of force. See Mitchell, 113 S. Ct. at 2201 (the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent").

-21-

threatening than Watts's.[11]

B.

Having concluded that Mrs. Dinwiddie violated FACE by using threats of force to intimidate Dr. Crist, we need not dwell on her numerous other violations of FACE. See 885 F. Supp. at 1291-94. We will, however, discuss one incident the District Court highlighted.

On July 28, 1994, Mrs. Dinwiddie physically assaulted Lenard Venable, a Maintenance Supervisor at Planned Parenthood, with an electric bullhorn. At oral argument, Mrs. Dinwiddie asserted that her attack on Venable did not violate FACE because Venable was not "providing reproductive health services." 18 U.S.C. § 248(a)(1). Mrs. Dinwiddie maintains that a worker at an abortion clinic who does not perform abortions or counsel pregnant women does not "provide" reproductive-health services. We decline to adopt this narrow interpretation of "provide."

A "term appearing in several places in a statutory text is generally read the same way each time it appears." Ratzlaf v. United States, 114 S. Ct. 655, 660 (1994). Thus, in interpreting the meaning of "providing reproductive health services," we examine how the word "provide" is used in 18 U.S.C. § 248(a)(3), a section of FACE that prohibits damaging or destroying a facility because "such facility provides reproductive health services" (emphasis added). The phrase "facility [that] provides reproductive health

---

[11]Mrs. Dinwiddie also argues that her statements were less threatening than those of the defendant in Gooding v. Wilson, 405 U.S. 518 (1972), who said to a police officer, "White son of a bitch, I'll kill you. You son of a bitch, I'll choke you to death." Id. at 519-20 n.1. That may be true, but it is also irrelevant. The Supreme Court reversed Wilson's conviction on overbreadth grounds; it never reached the question of whether his words constituted threats.

-22-

services" refers to a type of building.  See 18 U.S.C. § 248(e)(1). Buildings do not perform abortions or counsel pregnant women.  The word "provide" must, then, have a broader meaning than Mrs. Dinwiddie has suggested.

A building that houses an abortion clinic "provides" reproductive-health services because it is an integral part of a business in which abortions are performed and pregnant women are counselled.  The same logic applies to workers at an abortion clinic -- Dr. Crist could not do his job without either Planned Parenthood's "facility" or its workers.  Therefore, like Planned Parenthood's "facility," Venable "provides" reproductive-health services, and Mrs. Dinwiddie's attack on him violated FACE.

IV.

After concluding that Mrs. Dinwiddie violated FACE, the District Court issued a permanent injunction that orders her not to violate FACE and "not [to] be physically located within 500 feet of the entrance of any facility (a `buffer zone') in the United States that provides reproductive health services as contemplated by [FACE]" except "for the purpose of engaging in legitimate personal activity that could not be remotely construed to violate 18 U.S.C. § 248."  885 F. Supp. at 1296.  This "legitimate personal activity" exception permits Mrs. Dinwiddie, among other things, to carry a placard, distribute literature, and speak without an amplifier, so long as she does not intimidate, interfere with, or physically obstruct anyone or violate a local noise ordinance.  But "legitimate personal activity" does not include "activity that . . . is described in part III.A." of the District Court's opinion or "any use whatsoever of a bullhorn, megaphone, or other sound or voice amplifying device."  Id. at 1296-97.  Mrs. Dinwiddie argues that this injunction is unconstitutional because it is vague and overinclusive.  We agree with her, in part, and remand to the District Court with instructions to modify the injunction.

-23-

A.

For the sake of argument, we will assume (for now) that the injunction is content neutral.  In order to be constitutional, a content-neutral injunction that imposes time, place, or manner restrictions on speech or expressive conduct must "burden no more speech than necessary to serve a significant government interest," Madsen, 114 S. Ct. at 2525.  The interest advanced by the District Court's injunction -- protecting the safety of the staff and patients of Planned Parenthood and other reproductive-health facilities -- is "quite sufficient to justify an appropriately tailored injunction . . .." Id. at 2526.  Our task, then, is to decide whether the injunction "burdens no more speech than necessary" to achieve this objective.

We begin by examining the injunction's requirement that whenever Mrs. Dinwiddie is within 500 feet of a reproductive-health facility, she engage only in "legitimate personal activity that could not be remotely construed to violate [FACE]."  In Brown v. Polk County, 61 F.3d 650 (8th Cir. 1995) (en banc), we confronted a similarly worded provision.  The administrator of Polk County, Iowa, ordered that a county employee "immediately cease any activities that could be considered to be religious proselytizing, witnessing, or counseling . . .." Id. at 652 (emphasis added).  We held that this mandate violated the employee's rights under the Free Exercise Clause of the First Amendment because "[i]t would seem to require no argument that to forbid speech `that could be considered' religious is not narrowly tailored to the aim of prohibiting harassment . . .." Id. at 659.

What was true in Brown is even more true in this case.  Within 500 feet of a reproductive-health facility, the injunction forbids Mrs. Dinwiddie from doing anything that could be "remotely construed" to violate FACE or that is not "legitimate personal activity," a phrase which the District Court never completely

-24-

defines.  Also, to withstand constitutional scrutiny, the District Court's injunction must burden no more speech than necessary to further a significant government interest.  This standard is stricter than intermediate scrutiny, the test that we employed in Brown.  See Madsen, 114 S. Ct. at 2525-26.  In sum, this portion of the injunction is inconsistent with the First Amendment.[12]

The District Court's order that Mrs. Dinwiddie not engage in "activity that . . . is described in part III.A. of this permanent injunction" whenever she is within 500 feet of a reproductive-health facility is also unconstitutional.  Part III.A. contains the District Court's entire description of Mrs. Dinwiddie's conduct.  It mentions not only Mrs. Dinwiddie's violations of FACE, but also speech that is protected by the First Amendment.  For instance, in Part III.A., the District Court states:

> During one program, Dinwiddie was asked [by a television reporter] whether it is "right to be able to kill a doctor to save that unborn child" and responded:  "I think that abortion is a violent, violent business and that violence begets violence.  The Scriptures say that if you live by the sword, you die by the sword."

885 F. Supp. at 1293.  In the context of answering the reporter's question, her remarks were pure speech.  Enjoining Mrs. Dinwiddie from voicing this opinion to a reporter (or from signing a petition expressing this view), not only "burdens more speech than necessary," but is also an unconstitutional viewpoint-based

---

[12]This part of the injunction also runs afoul of Fed. R. Civ. P. 65(d), which requires that "[e]very order granting an injunction . . . shall be specific in terms [and] shall describe in reasonable detail . . . the act or acts sought to be restrained . . .."  With its prohibition on activities that can be "remotely construed" to violate FACE and its lack of a definition for legitimate personal activity, the injunction violates Rule 65(d) by calling on Mrs. Dinwiddie "to guess at what kind of conduct" is permissible in the buffer zones.  Calvin Klein Cosmetics v. Parfums de Coeur, Ltd., 824 F.2d 665, 669 (8th Cir. 1987).

restriction on speech.  The First Amendment, therefore, does not permit the injunction to incorporate Part III.A. of the District Court's opinion.

B.

Part III.A. does describe a number of activities, such as Mrs. Dinwiddie's use of threats of force to intimidate Dr. Crist and her attack on Venable, which it was certainly appropriate for the District Court to enjoin.  The remainder of the injunction helps to ensure that Mrs. Dinwiddie does not repeat this conduct.  Specifically, the injunction orders Mrs. Dinwiddie not to violate FACE and, within 500 feet of any reproductive-health facility in the United States, not to engage in activity that:

> (2) constitutes intimidation, physical obstruction, interference, force, or threats of force; (3) involves any use whatsoever of a bullhorn, megaphone, or other sound or voice amplifying device; (4) brings defendant in violation of any local noise ordinance; or (5) brings defendant in violation of laws related, but not limited, to assault, battery, trespass, harassment, vandalism, disturbing the peace, destruction of property, or unlawful possession of weapons, when such activity also has the effect of violating FACE.

885 F. Supp. at 1297.

We believe that an injunction limited to these provisions would not violate the First Amendment.  Like FACE, such an injunction would be content neutral; it would limit the manner in which Mrs. Dinwiddie may express herself "without reference to the content" of the message she conveys.  Madsen, 114 S. Ct. at 2523 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (internal quotations omitted)).  Moreover, the injunction would burden no more speech than necessary to protect the staff and patients of Planned Parenthood and other reproductive-health facilities.

-26-

The types of activity that the injunction would proscribe are quite narrow. Ordering Mrs. Dinwiddie to stop violating FACE, a statute that prohibits a limited range of disruptive conduct, would have a de minimis effect on her ability to express herself. Two of the injunction's other mandates -- that, within 500 feet of a reproductive-health facility, Mrs. Dinwiddie not engage in activity that "constitutes intimidation, physical obstruction, interference, force, or threats of force," or that violates a number of state laws "when such activity also has the effect of violating FACE" -- are subsets of the conduct prohibited by FACE. Accordingly, these provisions would be constitutional, as well.

The injunction's restrictions on using sound- or voice-amplifying devices and on violating local noise ordinances would also be consistent with the First Amendment. As the District Court noted, Mrs. Dinwiddie's "use of threats and intimidation in violation of FACE have been facilitated by the use of her bullhorn. Defendant has used her bullhorn not only to threaten and intimidate persons at Planned Parenthood, but also to assault physically workers such as Venable." 885 F. Supp. at 1297. These restrictions would help to ensure that Mrs. Dinwiddie does not repeat this or similar illegal conduct, while allowing her to carry signs, distribute literature, and speak at a reasonable volume even when she is within 500 feet of an abortion clinic.

Moreover, the radius of the 500-foot buffer zones does not violate the First Amendment. In Madsen, the Supreme Court invalidated an injunction's requirement that, within 300 feet of an abortion clinic, protestors refrain from physically approaching any person seeking services at the clinic. The Court explained that "[a]bsent evidence that the protestors' speech is independently proscribable (i.e., `fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, this provision cannot stand." 114 S. Ct. at 2529. Here, Mrs. Dinwiddie's speech was "independently proscribable" -- she

-27-

threatened Dr. Crist.  See also <u>id.</u> at 2528 (upholding an injunction's prohibition on "singing, chanting, whistling, shouting, yelling, use of bullhorns [or] sound equipment . . . within earshot of the patients inside [an abortion clinic]" during certain hours of the day).

Finally, the nationwide scope of the injunction is constitutional, as well.  The government has a significant interest not only in safeguarding Dr. Crist and Planned Parenthood's patients, but also in protecting the staff and patients of other reproductive-health facilities.  We agree with the District Court that a geographically narrow injunction would be insufficient to advance this interest:

> If the permanent injunction encompassed only Planned Parenthood or the Western District of Missouri, then this Court would jeopardize the lives and safety of providers and recipients of reproductive health services who are protected by FACE.  Defendant could easily frustrate the purpose and spirit of the permanent injunction simply by stepping over state lines and engaging in similar activity at another reproductive health facility.

885 F. Supp. at 1296.  Furthermore, in light of the narrow range of conduct prohibited by the injunction (as we have modified it) and Mrs. Dinwiddie's "consistent, repetitious, and flagrant unwillingness or inability to comply" with FACE, <u>id.</u> at 1295, a nationwide injunction would burden no more speech than necessary to protect the staff and patients of reproductive-health facilities. See <u>United States v. Carson</u>, 52 F.3d 1173, 1184-85 & n.10 (2d Cir. 1995) (rejecting a First Amendment challenge to an injunction that prohibits Carson, a former union officer who had engaged in racketeering, from "participating in any way in the affairs of or having any dealing, directly or indirectly, with . . . any labor organization . . ."); <u>Commodity Futures Trading Comm'n v. Hunt</u>, 591 F.2d 1211, 1220 (7th Cir. 1979) ("When the violation has been founded on systematic wrongdoing, rather than an isolated

occurrence, a court should be more willing to enjoin future misconduct.").

We conclude that an injunction limited to the terms discussed in Part IV.B. of this opinion would adequately protect the staff and patients of reproductive-health facilities and would be consistent with the First Amendment.

V.

For these reasons, we affirm the District Court's holding that the Freedom of Access to Clinic Entrances Act is constitutional and that Mrs. Dinwiddie violated FACE. We remand this case to the District Court with instructions to modify the injunction in a manner consistent with Part IV of this opinion.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.